# EXHIBIT L

Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Judge

```
FINJAN, INC.,                    )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )     NO. C 13-05808 HSG
                                 )
PROOFPOINT, INC., et al.,        )
                                 )
          Defendants.            )
_____)
```

San Francisco, California
Thursday, March 19, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

    KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
    990 Marsh Road
    Menlo Park, CA 94025-1949
    BY:  **LISA KOBIALKA**
        **MICHAEL LEE**
        **ATTORNEYS AT LAW**

For DefendantS:

    QUINN, EMANUEL, URQUHART & SULLIVAN LLP
    50 California Street - 22nd Floor
    San Francisco, California  94111
    BY:  **JENNIFER KASH**
        **IMAN LORDGOOEI**
        **ATTORNEYS AT LAW**

ProofPoint:        **MICHAEL LEMLEY, MICHAEL YANG**

Reported By:       Rhonda L. Aquilina, CSR #9956, RMR, CRR
       Court Reporter

| | |
|---|---|
| 1 | **Thursday - March 19, 2015**                    **2:08 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 |      **THE CLERK:**  We're calling 13-5808, Finjan, Inc. versus |
| 5 | ProofPoint, Inc. et al. |
| 6 |      Please step forward and state your appearances for the |
| 7 | record, please. |
| 8 |      **MS. KASH:**  Good afternoon, your Honor.  Nice to meet |
| 9 | you.  My name is Jen Kash from Quinn, Emanuel on behalf of the |
| 10 | defendant ProofPoint.  And with me is my colleague Iman |
| 11 | Lordgooei, also from Quinn, Emanuel, as well as Michael Yang |
| 12 | and Michael Lemley from ProofPoint. |
| 13 |      **THE COURT:**  Good afternoon, Ms. Kash. |
| 14 |      **MS. KOBIALKA:**  Good afternoon.  Lisa Kobialka on |
| 15 | behalf of the plaintiff Finjan, Inc.  And I'm here with my |
| 16 | colleague Michael Lee, as well.  We're from Kramer, Levin. |
| 17 |      **THE COURT:**  Good afternoon. |
| 18 |      All right.  So we're here for a hearing on the defendant's |
| 19 | motion to strike the infringement contentions and also for a |
| 20 | case management conference to set a course, now that I've got |
| 21 | the case. |
| 22 |      Here's how I'd like to proceed.  And I've read the papers |
| 23 | that are voluminous, and I've read them all, and my staff has |
| 24 | read them all, and I have to.  My inclination is to agree that |
| 25 | the infringement contentions don't meet the standards set out |

1    in the Patent Local Rule.

2        The Local Rule is clear that the contention needs to

3    identify within each accused instrumentality where the

4    infringing limitation appears.  And in looking at the --

5    looking at the contentions, it does appear that there is sort

6    of a very generalized use of screen shots and recitation of

7    language for each.

8        But, I have some real questions as to whether the level of

9    specificity required by the Local Rule has been met, and some

10   of that goes to the way that the products are grouped, the use

11   of a ProofPoint group, and an Armorize group, and whether that

12   obscures the level of detail that's required by the Local Rule.

13       And then I just have general questions regarding whether

14   the contentions as now framed are specific enough to give the

15   defendant reasonable notice of the theory of infringement.  And

16   so I actually have some particular questions, and that's why I

17   will be hearing from the plaintiff on these particular issues

18   to be sure that I understand the lay of the land correctly.

19       **MS. KOBIALKA:**  Okay.  And I'd be happy to specifically

20   address -- you have to keep in mind, with the infringement

21   contentions, that what we are doing here is going off of the

22   white papers, the data sheets, the descriptions of technology,

23   and all the publicly available information that we have.

24       When we served those infringement contentions, that was

25   about four months after we had filed the Complaint, and at that

1    point we don't have access to their source code, any of their

2    technical information.  And a lot of these patents really go

3    to -- they're directed at what specific rules, routines, source

4    code, elements that may be occurring in the back end.

5         We can identify the functionality as they disclose it.

6    And particularly given the nature of this industry, this is

7    securities software.  They are not going to be publishing their

8    specific rules and make those available, because hackers would

9    be able to bypass any of the rules that are provided out there

10   publicly.

11        So, what we have to do is basically utilize all the public

12   information that we can.  And then once we have a chance to

13   really get into all the other technical information, we can

14   provide more.  But, we've provided the notice based on the

15   public information.

16        And the case law is pretty clear when it comes to software

17   and source code in particular, the nature of this type of

18   patents that are involved here and the technology involved

19   here.  I'd refer you to the *Network Caching Technology versus*

20   *Novell* case.  They said that if you can't identify the specific

21   routines a lot of times, you're going to need that source code

22   to analyze it, to provide that.

23             **THE COURT:**  Well, I saw that.  But, you now have the

24   source code; right?

25             **MS. KOBIALKA:**  We do.  There's some issues.  We don't

1  have all of the source code.  We were able to finally take a

2  deposition for identification of the organization of the source

3  code, some five months after we served a 30(b)(6) notice.  That

4  deposition took place yesterday.  And the night before the

5  deposition took place, they produced thousands of directories

6  that were the organization for the source code, but then they

7  wouldn't bring the source code to the deposition.

8       So, you know, we're still having some issues, and we've

9  got to work through with respect to discovery that will be

10  required to provide those kinds of specific requirements.

11       And there's going to definitely be, I'm afraid, more

12  motions to compel if we can't get this information, if we can't

13  get the depositions that we've noticed up for five months, and

14  get the documentation.

15       **THE COURT:**  So, this is a contentious case.  I get it.

16  I get that there's been a lot of discovery practice.  I get,

17  you know, heads are being butted, adjectives and adverbs are

18  being thrown around.  I get it.  And to the extent you need to

19  follow-up on any discovery issues, there's a process in place

20  to do that with a magistrate.

21       But, what I'd like to be sure that I understand is my

22  piece of this right now, which is what needs to be done with

23  the contentions to make sure that they meet the Local Rule.

24       And so I understand the background of your position, but I

25  do have these particular questions that I'd like to ask you to

1   make sure I understand.

2        So, the first is with regard to the combination charts.  I

3   don't know that there's any dispute that the combination chart

4   is not inherently improper.  But, for example, here, there's

5   one grouping of products, and the grouping says its products

6   containing either Zero-Hour or Malware Analysis.  And the

7   potential challenge there is what's needed to make that

8   grouping work is some basis to conclude that the two work the

9   same way in the ProofPoint products.

10       I know that there is also this back and forth about, well,

11  these are actually just different names for the same product.

12  And the problem with that is that the contention documents

13  should be comprehensible on its face.  In other words, it may

14  be true that these are different names but they're similar.

15  But, what I think is hard for me to understand right now,

16  coming to this new, is how the contention in a comprehensible,

17  self-contained way does what the Local Rule requires, which is

18  to show where each limitation appears in each accused

19  instrumentality for each claim.

20       And so on that point, shouldn't there be two charts for

21  the ProofPoint products, one for Zero-Hour and one for Malware,

22  so that it would be clear, and we don't have to address this

23  question of whether they're similar or different names.  It

24  just would be broken down in a way that makes it clear on the

25  face of the contention.

1      **MS. KOBIALKA:**  Yeah.  So with respect to those, as I

2 understand it, these are technologies that they have that they

3 are placing in the various products.  We can break those out

4 separately.  We thought we had done that with the examples, the

5 citations that we specifically had provided, and then addressed

6 the products themselves.  So we went through -- and I really

7 addressed the products that contained both the Zero-Hour as

8 well as the -- what was the other one -- the other type of

9 technology, the Malware Analysis Service.  We tried to do that,

10 and we separated out each of the elements and pointed to screen

11 shots and identified them, but then tried to really tie it to

12 each product.  So we were showing where it was as it related to

13 the product, and tried to do that as specifically as we could

14 with all of the discussion, the explanation about the

15 functionality, and what they were doing.

16      **THE COURT:**  Okay.  But, is there a reason that we

17 can't have a chart that simply shows these are the products

18 where the element at issue is Zero-Hour; these are the products

19 where product at issue is Malware Analysis.

20      **MS. KOBIALKA:**  We can specify that.  That's not a

21 problem.  We can separate out those charts.

22      **THE COURT:**  All right.  And with regard to the

23 Armorize products, again, it does strike me that there has not

24 been the mapping out of individual products within that group

25 in a way that ties with specificity to each claim.  Is that --

1    what am I missing?

2         MS. KOBIALKA:  No.  We actually have a separate

3    paragraph for each separate product.  So I could take a look

4    at, for example, Claim Two, this is chart Exhibit F to

5    Mr. Stakes' declaration, and this is in connection with the

6    '822 patent.

7         But, what we did is we went through, and we identified

8    HackAlert as a separate product.  We identified CodeSecure as a

9    separate product, SmartWAF, and then the Malvertising, which it

10   may not have said Malvertising, this is the product, but we

11   actually utilized that language in the chart itself for each of

12   the elements.  So we really did go element-by-element and

13   address each of those individual products.  We didn't do the

14   technologies like we had done with the ProofPoint.

15        THE COURT:  But aren't all of the infringement

16   contentions for the Armorize products in one single chart per

17   patent?

18        MS. KOBIALKA:  Yes, we did.  We can break out the

19   chart to separate for each of the individual products if we

20   wanted to, but we included all of it.  And we were specific.

21   We identified:  This is SmartWAF for this element; this is

22   separately CodeSecure for this element, and so on.

23        THE COURT:  Right.  Well, exactly.  And it seems that

24   it should be separated out, right -- because the point is for

25   each product what's the infringing element -- in a way that is

1  evident on the face of the contention.  Why would we -- why

2  would you not do that?

3       **MS. KOBIALKA:**  Well, first of all, our charts, as it

4  was, was 1,095 pages, so now that will definitely --

5       **THE COURT:**  It's not a length question.  It was very

6  long.  I get that.

7       But, what my problem with the chart is that, again, it

8  seems to obfuscate the location of the infringing elements

9  rather than pinpoint it in a way that the Local Rule requires.

10      I think it's to everyone's advantage to simply tee up the

11  issue of what we're talking about here.  And having long screen

12  shots used for multiple claims, to me, it doesn't seem to

13  accomplish the purpose that the Local Rule is trying to get at,

14  which is let's figure out specifically where the infringing

15  element is claim by claim, and that way everybody is on the

16  same page.

17      **MS. KOBIALKA:**  We can split it out in charts.  We

18  really thought we had done that, because we started -- we said,

19  for example, the HackAlert, and then we were very specific and

20  provided the screen shots specific to HackAlert; then the next

21  paragraph would be CodeSecure, and then we were very specific

22  about that.  You know, like further down, we thought we had

23  divided that out for each and every -- well, we had divided

24  that out for each and every element.  But, we can separate them

25  out into separate charts.  That's fine.

1     **THE COURT:**  Great.  And so, for example, looking at

2   the claim, Claim 1A under the '154 patent, the claim describes

3   a system for protecting a computer from dynamically generated

4   malicious content, and then there's references to "first

5   function" input and "second function," and then the explanation

6   in the next column is lots and lots of screen shots and links

7   to web sites.  And, you know, the point is where in all of that

8   is -- are those claim elements, and how are we supposed to know

9   that?

10     And it's not going to be particularly helpful to have you

11   explain that to me now on the record.  The point is it should

12   be apparent on the face of the contention.  That's the point of

13   this exercise.

14     And so I'm giving that as an example.  If you'd like, you

15   can point me to where in these several pages it is.  But, I

16   think you understand my point.

17     **MR. LEE:**  Just to be clear.  Each of the screen shots

18   have a narrative, and that -- the narrative ties directly to

19   each of the screen shots.  So when -- that's the example that

20   you pointed to where the scripts -- obfuscated job script is

21   definitely tied with -- these are words within the screen shot.

22     **THE COURT:**  Right.  But, how do I know -- so I've got

23   this word -- I've got this phrase in the claim language "first

24   function."  How would one know where the first function appears

25   in the challenged instrumentality based on what you presented?

1       **MR. LEE:**  Well, in the narrative, in Appendix K at 1

2  it talks about there is "analyzes exploit kits, exploit code,

3  obfuscated scripts."  So within these obfuscated scripts

4  there's a first function and second function.  It's very clear

5  from the narrative, and also it ties directly to the screen

6  shots.

7       **THE COURT:**  Meaning where?  Where -- like where is the

8  language that describes what a first function is?

9       **MR. LEE:**  The obfuscated scripts.  These are

10  obfuscated scripts with first and second screen shots.  I mean,

11  that's how it's described in the patent as well.

12       This is -- I mean, I understand.  It's apparent, I guess,

13  to -- it's very clear from, if you look within context, if you

14  just look at the screen shot itself, rather than with a

15  narrative.  It's -- you know, you can't put it in a silo.  It's

16  intended to be used together.

17       **THE COURT:**  All right.  Ms. Kash.

18       **MS. KASH:**  Your Honor, this is the issue we've been

19  grappling with.  I think you understand it quite well, and I

20  think Magistrate Lloyd also understood this issue when he saw

21  the interrogatory and asked them to -- with reference to only

22  these same contentions, and said it was deficient under the

23  same Local Rule, and then asked them to amend that

24  interrogatory, and they simply cut and paste these same

25  contentions.

1    We just simply feel that this case has been pending since

2  April of -- or since December of 2013, and without any

3  specificity, and we shouldn't be forced to keep litigating

4  until they provide sufficient contentions.  If they say they

5  can, I haven't seen good cause as to why they didn't earlier.

6  And I don't think that my client should continue to have to

7  spend money and time until they do so.

8    **THE COURT:**  All right.  Let's turn to the willful

9  infringement issue, the indirect infringement, and the Doctrine

10  of Equivalents issue.

11    First, with respect to willful infringement, in looking at

12  the complaint, I didn't actually see an allegation of willful

13  infringement.  Why is it coming up for the first time in the

14  contentions?

15    **MS. KOBIALKA:**  Yeah.  So the contentions require you

16  to address it specifically.  We have this contention out there.

17  We don't have the discovery or the Rule 11 basis to assert it

18  in the complaint at the time.

19    There were communications between the parties predating

20  the lawsuit.  They -- one of the very first interrogatories we

21  asked them is when did you first learn of the patents?  What

22  they've told us at this point, based on what they know, they

23  learned of the patents when the lawsuit was filed.

24    So, we don't have a willfulness allegation.  We've

25  contended that that's something that's there because it's a

1    requirement of the Rule.  We don't want to necessarily waive

2    that.  And at the appropriate time we would amend our pleading

3    to specifically address it, but that -- we were specific in our

4    language.  It's just a contention.

5         **THE COURT:**  All right.  I see.  And I'll confess that

6    the standards for alleging willful infringement strike me as

7    very muddy.  I think there are cases going both ways, even in

8    this district, with regard to the question of whether

9    post-filing conduct can be the basis for a willful infringement

10   claim.  And I'm sure that -- you cited your cases, you've cited

11   your cases, and I think I'm just going to have to sort through

12   those and figure out -- figure out where to come out on that

13   question.  I don't think it's -- I don't think it's directed

14   clearly by federal circuit precedent.

15        **MS. KASH:**  I would just add, your Honor, if I might,

16   just quickly on that issue.  In addition to the law on that is

17   if they don't have it in their complaint, I actually think that

18   they're incorrect, that they don't have the Rule 11 basis to

19   assert it in their infringement contentions, which are also a

20   signed document.

21        So I think that the issue here is simply that either

22   willfulness is in the case or it's out of the case.  They

23   could, if they get discovery later on, add it to their

24   complaint and then have a basis for their infringement

25   contentions.  But it's kind of backwards, and we were surprised

1    to see it, so --

2         **THE COURT:**  Well, are you saying that there's

3    authority for that particular point?  In other words, if a

4    basis for a willful infringement contention were discovered

5    after the filing of the complaint, is it your -- are you saying

6    there's law that says before you can comply with the Patent

7    Local Rule, you've got to go back and amend before you can do

8    that?  I don't know that that's --

9         **MS. KASH:**  I have no idea, your Honor, on that

10   particular point.  My understanding is that they should seek

11   leave to amend the complaint if they have a willfulness

12   allegation.

13        Again, we've just been in large part confused throughout

14   the case regarding the contentions themselves.  I don't think

15   the willfulness in and of itself, because we didn't have any

16   notice until post-filing, is really the biggest issue we have

17   here.

18        I think that the issue that we have here is that overall

19   we're not on notice of any of their theories of infringement.

20   And so the fact that they put something else in there that

21   wasn't in the complaint added to the overall confusion.

22        **THE COURT:**  All right.  And then on the indirect

23   infringement question, the defendants argue that the Supreme

24   Court's recent *Limelight* case establishes the -- that to get

25   over the hump with regard to the indirect infringement

```
 1   requirement under the Patent Local Rule, that an actual direct
 2   infringer would have to be identified.  And in looking at it,
 3   we saw that there are cases from this district, the DCG case
 4   from 2012, that says that that's not the case.
 5        And so my question for the defendants is, is it your
 6   position that Limelight has now changed the field such that
 7   Limelight drives the conclusion that the Local Rule now should
 8   be read to include a requirement of an identification of a
 9   particular direct infringer?
10        MS. KASH:  Yes, is the short answer to that.
11        The Limelight case, as you probably are aware, in light of
12   many of the cases that have been coming out of the Supreme
13   Court, have been trying to address some of the issues that
14   exist with business method and software patents, and
15   collectively; and one of those is how do you plead the
16   difference between a direct infringement claim and a claim of
17   indirect infringement.
18        And I think that was where the Supreme Court was trying to
19   provide guidance to all the federal courts on how you're
20   supposed to be giving notice of that to the party, the
21   defendant who is being accused of that act.  Similar to the
22   notice requirements that you have for showing direct
23   infringement by the defendant, you're going to be including a
24   claim of indirect infringement, and you have to have the
25   allegations set forth as to at least some degree of showing
```

1   inducement.

2       For example, you know, even under some of the older cases

3   there were some examples of what you could provide.  We set it

4   forth at page 21 of our brief.  Yes, we do think that the

5   *Limelight* case requires as a predicate proof of direct

6   infringement by a single actor.

7           **THE COURT:**  Well, it requires -- I don't disagree with

8   you that it requires proof of that ultimately at trial.  The

9   question is whether that necessarily drives the conclusion that

10  now the Patent Local Rules' disclosure requirement must be read

11  to also include that disclosure at this stage.  I think that's

12  the question.

13          **MS. KASH:**  If you look at the *Blue Spike* case, your

14  Honor, that's the case that has been -- that has come down

15  since the *Limelight* case that's in -- I believe that's in this

16  district, if I'm not mistaken.  And that's a case in which the

17  Court found that it is well established in this district that

18  boilerplate language asserting indirect infringement does not

19  satisfy Patent Local Rule 31D, nor or generic allegations that

20  recite the elements of our general theory behind indirect

21  infringement sufficient under the Local Rule, and that's at

22  2015 Westlaw 335842 at 7, and that's citing to another case in

23  the Northern District of California as well, *France Telecom*,

24  which was May of 2013.

25      So, in essence, what I feel the *Blue Spike* case was doing

1   in this jurisdiction was taking the requirements of pleading

2   under the contentions that had previously been in place in this

3   district, such as the case that you were referring to, the *DCG*

4   case, and now the *Blue Spike* case was looking at it in light of

5   the *Limelight* case.

6          **THE COURT:**  Although it doesn't -- I'm looking at *Blue*

7   *Spike* right now.  It doesn't discuss *Limelight* at all, does it?

8          **MS. KASH:**  Well, I don't know if it discusses this

9   point.  I could pull up the case itself.  I'll have to take a

10  look at it.

11      Do you know whether or not you cite directly from the *Blue*

12  *Spike* case to *Limelight* or is it just a case that came down

13  after --

14         **THE COURT:**  Well, I don't -- I think it speaks to the

15  general question of what level of specificity is involved, but

16  I don't think it speaks to the question in particular of

17  whether a specific direct infringer needs to be identified.

18         **MS. KASH:**  I think that the issue -- and I do not see

19  it citing the *Limelight* case.  But, if you look at the case in

20  the *Blue Spike* case at -- I think it's in the Westlaw at the 7

21  it did.  It is still talking about what specifically in a 31

22  needs to be pled for -- sufficient to show indirect

23  infringement.  And I think what's happening there is it's

24  saying that it has to be pled with a specificity.  Boilerplate

25  language isn't allowed.

1   And then the *Limelight* case, I think, is discussing it at

2   a substantive level what that specificity is.  And that would

3   be our contention in that situation.

4       **THE COURT:**  Okay.  And as I said, we've got *Blue*

5   *Spike*, and then we've got some cases going the other way in

6   terms of the pleading standard, the district court level here.

7       So, Ms. Kobialka, what is your take on what *Limelight*

8   means at the contention stage?

9       **MS. KOBIALKA:**  *Limelight* doesn't address the

10  contention stage at all, and that's not how that case is used.

11  It's really what your burdens of proof are going to be at

12  trial, and when you get to the summary judgment stage and

13  otherwise.

14      Keep in mind, too, we did do about nine pages of

15  disclosures regarding indirect infringement, inducing

16  infringement that starts on page 12 of Exhibit M that was in

17  the beginning of our contentions, and we specifically

18  identified customers, subscribers, users, and developers as

19  those parties, those third parties.  We don't have the exact

20  names of who all those people are, because, once again, we

21  served our infringement contentions at a time when we hadn't

22  gotten any discovery.  They're not, so far, willing to identify

23  who all their customers, developers, users, and subscribers

24  are.  So that may be something else.

25      But, we have identified the classes, and specifically on

```
 1   page 12 and 13 of those contentions as well.  So we believe

 2   we've done more than enough already at this point, and the case

 3   law in and of itself says that what we've done is sufficient.

 4        In *Blue Spike*, they didn't identify anybody.  They just

 5   said Adobe was infringing.  They didn't identify any third

 6   party, who those classes of third parties are or otherwise.

 7             MS. KASH:  Your Honor, if I might, I have a -- under

 8   just the standard that Judge Grewal has articulated in one of

 9   the cases that you were saying that maybe you looked at, saying

10   that the induced infringement contention isn't specific enough.

11   We did a comparison, and it's very short, of their contentions

12   with the *Creagri* case, and which is talking about the indirect

13   infringement contention in Local 31, and it's almost identical

14   to what Judge Grewal rejected in this district.  I could hand

15   that up to you as well.

16             THE CLERK:  Do you want it?

17             THE COURT:  Sure.

18             MS. KASH:  And so whether or not the *Limelight* or the

19   prior standard is applied, whether or not *Limelight* is meant to

20   change that or just clarify the burden of proof, we find that

21   the inducement contentions that they have in their contentions

22   are insufficient under any of the case law in this

23   jurisdiction, and we think that it matches up, very clearly

24   matches up to what the sort of generalities are that these

25   courts have rejected previously.
```

1       **THE COURT:**  All right.  I understand your position.

2       **MS. KOBIALKA:**  And I can speak to this directly, since

3 I was counsel on the *Creagri* case as well.  This is a

4 complete -- complete misrepresentation of what was represented

5 in those cases, and this is not what they quoted under Finjan's

6 contentions, is what we've asserted.

7    We've identified, as I stated, customers, subscribers,

8 users, and developers.  That's completely missing from what

9 they cited to you, so that's not what we've alleged.  We've

10 provided disclosures, and there's nine pages of it contained in

11 our contentions.

12       **THE COURT:**  All right.  Well, I can guarantee you,

13 both parties, that the basis for whatever decision I make on

14 this will not be solely on the document that just got handed

15 up.  I'll read the cases, read the contentions, and make a

16 decision.

17    All right.  Anything else on the motion?

18       **MS. KOBIALKA:**  There are no unnamed products.  There

19 was an accusation that somehow we have not identified all the

20 products, and hopefully that's been made clear through all of

21 our disclosures.  We've specifically identified the products by

22 name.

23       **THE COURT:**  But, no, I thought that there were some

24 for which the answer in your brief was, well, we didn't name

25 that particular product, but it's because it's a different name

1   for some other product.  That's the issue that I brought up

2   prior at the beginning of the hearing.

3          **MS. KOBIALKA:**  No.  So what we were saying is that

4   sometimes Armorize SafeImpressions is also called ProofPoint

5   SafeImpressions.

6          **THE COURT:**  And are both of those products named in

7   the contentions?

8          **MS. KOBIALKA:**  Yes.

9          **THE COURT:**  Okay.  This is the representation I want

10  to hear from you.

11         Is every product for which you're alleging infringement

12  named by name in the contentions?  If you make that

13  representation to me, I'll take it, and then we'll go back and

14  look at it.  But, in our review it did appear to be that that

15  wasn't the case.

16         **MS. KOBIALKA:**  So, at the beginning of each of the

17  claim charts, we identify what the accused products are.  So

18  for Armorize products we identified HackAlert, CodeSecure,

19  SmartWAF, SafeImpressions and Malvertising Protection, so we

20  identified that.

21         Similarly, for the infringement contentions, for the

22  ProofPoint products, we listed all of those products out, said

23  we also understood that there were these other technologies,

24  the Zero-Hour, and so forth, that was contained in those.  But,

25  we identified those products.  So there's seven products for

1   ProofPoint, four products specifically for Armorize.  We

2   understand that that actually may not be a total of 11

3   products, because the SafeImpressions for Armorize is sometimes

4   also called SafeImpressions for ProofPoint, for example.

5       So that's what we we're referring to when we said some of

6   the naming convention would be a little bit difficult, because

7   they've switched up the names.  But, we have done every effort

8   to identify specifically what those products are, and we did in

9   our meet and confers, and we sent them letters, and that's all

10  attached to their briefing.

11      And then separately in the interrogatory, if you look at

12  the long interrogatory, I think it was Exhibit BB, we

13  specifically said these products are infringing these specific

14  claims of this patent, and then we provided the chart.  So we

15  did much more with the interrogatory than just what we had done

16  in our infringement contentions to be as clear as we possibly

17  could about what the accused products are.  But, we have been

18  identifying that to them in every meet and confer as we've gone

19  through.

20          **THE COURT:**  All right.  Anything further?

21          **MS. KASH:**  I think it's pretty clear, your Honor, that

22  they haven't met their burden under the Local Rule.  I think

23  that they have not -- identification of the products that are

24  being accused is not the standard.  It's very clearly set out

25  in 31 what they're supposed to do.  And I think there were even

1    admissions today on the record where Ms. Kobialka admitted that

2    they could have done it, but they didn't.

3        And at this point this late in the game we feel that

4    there's not good cause for them to be at this stage of the game

5    amending these contentions and/or at least amending them so

6    that we have sufficient ones to go by in this case.

7            THE COURT:  All right.  Submitted?

8            MS. KOBIALKA:  I mean, do you want me to argue for

9    good cause?  I can articulate all the positions.  We have it in

10   our briefing, but --

11           THE COURT:  You don't need to do that.

12           MS. KOBIALKA:  Thank you.

13           THE COURT:  All right.  So I'll take the motion under

14   submission.

15       From a housekeeping standpoint, what I would suggest we do

16   is at least have you all hold dates for a rescheduled claim

17   construction tutorial and *Markman* hearing.  Those were vacated

18   when the case came to me.

19       I'd like to set the tutorial for June 2nd at 10:00 o'clock

20   from, say, 10:00 to 11:30, and then set the claim construction

21   hearing on June 24th from 10:00 o'clock to 1:00 o'clock.

22           MS. KOBIALKA:  Your Honor, I'm in trial, as is my

23   other co-lead counsel, Paul Andre, on the June 24th date.

24           THE COURT:  How -- when will your trial be over?

25           MS. KOBIALKA:  We expect it will be over, I want to

1   say, after the July 4th weekend.  I have to look at the

2   calendar.

3   　　　　　THE COURT:  What day of the week is that, Madam Clerk;

4   is that a Wednesday?

5   　　　　　THE CLERK:  I'm sorry.  What day?

6   　　　　　THE COURT:  June 24th.

7   　　　　　THE CLERK:  June 24th is a Wednesday.

8   　　　　MS. KOBIALKA:  I mean, if there's no other dates, we

9   can try to find someone else to do it.  I don't want to hamper

10  the schedule here.

11  　　　　　THE COURT:  Well, if you can, I'd like to do that.

12  And maybe your other commitment will clear.  But, I think it

13  would be good to have those dates locked in, because I know

14  schedules get filled up quickly.

15  　　　　MS. KOBIALKA:  So June 24th -- I'm sorry, starting

16  what time?

17  　　　　　THE COURT:  10:00 a.m.  And we'll set aside from 10:00

18  till 1:00.

19  　　　And then with regards to the rest of the case schedule,

20  the parties proposed a joint schedule of dates going forward

21  after the claim construction hearing.  I'm prepared to adopt

22  those dates, and we'll do a written order confirming that.

23  　　　I will keep the existing pretrial conference date of

24  February 23rd of next year, and the current trial date of

25  March 7th of next year.

1          MS. KOBIALKA:  Would that be for the ten days I think

2     the parties had requested?

3          THE COURT:  Yes.

4          MS. KOBIALKA:  And I think you do half days for trial,

5     so we need to plan accordingly.  I just want to make sure.

6          THE COURT:  Was the prior schedule full trial days?

7          MS. KOBIALKA:  Yes.

8          THE COURT:  Five hours a day.

9          MS. KOBIALKA:  Yes.

10          THE COURT:  So -- well, let's have it start on the

11     7th.  We'll figure -- you know, we'll extend it somewhat based

12     on the fact that the trial days are shorter than you had

13     anticipated, but block out a start date there and figure two

14     weeks.

15          MS. KASH:  One additional housekeeping issue with

16     respect to that is that the -- because of the voluminous nature

17     of the claims, and it feeds into the motion that the Court just

18     took under submission, we had requested that we be allowed to

19     have extra pages for our claim construction briefing and a

20     sur-reply, given the number of products and claims that were at

21     issue.  That was in our proposal.  I don't know if that's

22     something you considered.

23          THE COURT:  I did see it, and I'll rule on it at the

24     time that I issue a ruling on the other motion.

25          MS. KASH:  Okay.  Thank you, your Honor.

1        **MS. KOBIALKA:**  May I ask, just for the tutorial and

2  claim construction, do you have any specific preferences about

3  having experts provide -- I assume you could ask them questions

4  at that time.

5      This is usually something that we cover at the CMC, so it

6  would be helpful for us to understand how you'd like to go

7  about that.

8        **THE COURT:**  Sure, that's fair.  I don't have any

9  particular preference at this point.  This will be tutorial

10  number 1, so make it helpful.  That's my advice.

11                              (Laughter)

12        **MS. KASH:**  Great.

13        **MS. KOBIALKA:**  Fair enough.  Thank you.

14        **THE COURT:**  All right.  Thank you.

15               (Proceedings adjourned at 2:45 p.m.)

16                        ---oOo---

17

18

19

20

21

22

23

24

25

1
2
3      **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6
7      DATE:   Friday, March 20, 2015

8
9
10
11      _____

12      Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                    Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25